UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
     v.                                 )    Cr. No. 10-056-01 S
                                        )
ABDULFATAH OLADOSU.                     )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Defendant Abdulfatah Oladosu was indicted on one count of possession of, and one count of conspiracy to possess, one hundred grams or more of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) and 846, and 18 U.S.C. § 2. (ECF No. 8.) Before the Court is Defendant Oladosu's January 21, 2011 motion to suppress all evidence obtained by virtue of the warrantless utilization of a Global Position System Tracking Device ("GPS"), as fruits of a violation of Defendant's Fourth Amendment rights. (ECF No. 47.)

I.  Background and Travel

Because of the unusual travel of this case, a brief review of the procedural history is appropriate. The Court held a two-day evidentiary hearing on Defendant's motion on June 16 and 21, 2011. Shortly thereafter, on June 27, 2011, the Supreme Court granted a petition for writ of certiorari in the case of <u>United</u>

States v. Jones, on the question of whether warrantless GPS installation and monitoring on public roads violated the Fourth Amendment. 131 S. Ct. 3064 (2011) (Mem). This Court requested supplemental briefing to address the arguments that were then pending before the Supreme Court. The parties submitted briefs in December of 2011, some time after the Supreme Court heard oral argument in the Jones case. The Court notified counsel that it would await the Court's decision in Jones before acting on the motion to suppress.

On January 23, 2012, the Supreme Court issued its decision in Jones, holding that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. United States v. Jones, 132 S. Ct. 945, 949 (2012) (footnote omitted). The Court requested supplemental briefing in light of the Jones decision and heard oral argument. In the face of the Jones decision, the government maintains its objection to Defendant's motion to suppress on the basis that, even if the installation and use of the GPS device was a violation of Defendant's Fourth Amendment rights, the exclusionary rule should not apply for two reasons: (1) because the officers relied on judicial precedent in using the GPS, the evidence is admissible pursuant to the good faith exception to the exclusionary rule, as recently applied in Davis

v. United States, 131 S. Ct. 2419 (2011); and (2) the evidence is admissible pursuant to the so-called attenuation doctrine.

For the reasons set forth herein, the Court finds that the good faith exception does apply in these circumstances, and therefore the motion to suppress is denied.

## II. Findings of Fact

The following facts are derived from the testimony of Detective Robert DiFilippo of the North Providence Police Department, who was the only witness to testify during the evidentiary hearing.[1]

### A.   The October 2009 Investigation

In October of 2009, Detective DiFilippo was assigned to the Rhode Island State Police High Intensity Drug Trafficking Area (HIDTA) task force when he became involved in an investigation of a Nigerian heroin smuggling organization operating in Rhode Island. (Hr'g Tr. Vol. I 6:21 – 7:9, June 16, 2011, ECF No. 59.)   As part of that investigation, Detective DiFilippo

---

[1] Detective DiFilippo testified in great detail regarding the investigation and the manner in which the GPS device was used.   Now that the Supreme Court in Jones has held that a warrant is required before law enforcement may place such a device on a vehicle, the details of the investigation are less important.   The key issue is a legal one -- whether the good faith exception and/or attenuation doctrine excuse law enforcement's otherwise unconstitutional, warrantless search. Therefore, the Court will truncate its factual findings to bare essentials.

obtained information from multiple cooperating witnesses connecting Defendant Oladosu to the organization. The witnesses also provided information regarding where he lived and what vehicle he drove.

Beginning in January of 2010, Detective DiFilippo took a number of steps to further his investigation into this organization and to corroborate what he had learned with respect to Defendant Oladosu. He and other members of the HIDTA task force conducted spot surveillance, installed a pole camera in Oladosu's neighborhood, and obtained a pen register on his cellular telephones.

On February 12, 2010, Detective DiFilippo installed a GPS device on Defendant Oladosu's car while it was parked on Pavilion Street in Providence, across from the mosque Defendant attended. (Id. at 45:6-17.) The detective placed the GPS under the rear bumper, using a magnet. (Id. at 47:12-19.) Since this particular GPS was an all-in-one device (meaning that the GPS and its batteries are contained in one device), Detective DiFilippo did not have to wire the GPS into the car. The all-in-one GPS draws power from its own batteries, as opposed to from the car. DiFilippo testified that he chose to install the GPS on a public roadway because he thought it "would be better for [him] and the case and the application of the GPS." (Id. at 167:20-22.)

Detective DiFilippo did not obtain a warrant to install, or anytime thereafter to continue to employ, the GPS on Oladosu's car. (Id. at 54:20-25.) Detective DiFilippo testified as to his reasons for not obtaining a warrant as follows:

> I'm not aware of any rules, regulations or laws that require us to obtain a search warrant prior to applying this GPS device. It's not a policy within the police department, of the North Providence Police Department or the Rhode Island State Police HIDTA task force to obtain a search warrant prior to putting an all-in-one device on.

(Id. at 55:19-25.)[2]

Detective DiFilippo also testified, however, that he would "normally get approval from the supervisor" to install a GPS device and that, prior to installing the GPS device in this case, he contacted the U.S. Attorney's Office for approval. (Id. at 56:1-4.) In his capacity as a detective, Detective DiFilippo routinely executed search and arrest warrants and was generally familiar with the laws and constitutional requirements concerning obtaining warrants based on probable cause. (Id. at 8:9-17.)

Approximately two weeks after the initial installation of the GPS, Detective DiFilippo replaced the batteries, "in the

---

[2] Detective DiFilippo testified that, to install a hard wire GPS, he believed that a search warrant would be required because it would require altering the vehicle. In terms of reporting capabilities, there is no difference between a hard-wire GPS and an all-in-one GPS.

late night hours, in the cover of darkness," while the car was parked in the driveway of Oladosu's home. (<u>Id.</u> at 48:24-25.) He did so under cover of darkness to avoid detection.[3]

Detective DiFilippo provided testimony about the different ways in which law enforcement could use the GPS to track an individual's activity. Every time the vehicle stops, and remains stopped for a designated amount of time, the location of that stop is registered in what is called a stop report. At the same time, however, even without the vehicle stopping, law enforcement can monitor the vehicle's travel by watching it in real-time. A program that accompanies the GPS provides an animated image of the vehicle on a map. In live mode, "it's sending signals out consistently, which gives us a true and accurate image of where he's operating." (<u>Id.</u> at 60:25 – 61:2.) When members of the team were not actively viewing it, they would set it to send signals out less frequently. They would use live mode when they were conducting physical surveillance of the vehicle.

---

[3] Defendant argues that the fact that Detective DiFilippo crossed onto the property to replace the batteries magnifies the Fourth Amendment violation here. But crossing onto Defendant's property is not relevent to the analysis -- the issue is whether the detective operated with good faith in utilizing the GPS without a warrant, regardless of where the car was parked when he placed it, or changed its batteries.

From February 12, 2010, the date the GPS was first installed, to March 30, 2010, the date of Defendant Oladosu's arrest, and with the exception of the one time the GPS was removed to change the batteries, the GPS was continually affixed to Oladosu's vehicle. (Id. at 52:18 – 53:19.) The GPS was transmitting data during this entire time, except between March 2 and March 19 when it went into sleep mode because Oladosu was out of the country. (Id. at 54:3-7.)

B.   The Events of March 29 and 30, 2010

On March 29, 2010, Detective DiFilippo was reviewing the GPS data in live mode and noticed something that he found unusual:  Defendant was driving around on the back streets, with no apparent destination, in the area of Chalkstone and Academy Avenue in Mount Pleasant. (Id. at 71:19 – 72:3.) Of course, the GPS data did not tell DiFilippo who was operating the vehicle or whether there was more than one person in the vehicle at the time, but by responding to the area to perform physical surveillance, DiFilippo was able to determine that Oladosu was the driver and that he had a passenger in his car.

Detective DiFilippo followed Oladosu's car as it drove on back streets until it pulled over where a letter carrier was standing on the sidewalk. (Id. at 75:4-9.) Oladosu and his companion had a conversation with the letter carrier through the passenger-side window. (Id. at 75:9-11.)

As soon as DiFilippo observed the conversation with the letter carrier, he notified the members of HIDTA, who responded to assist with physical surveillance. (Id. at 76:21 – 77:3.) At Detective DiFilippo's direction, another detective, Detective Chabot, spoke with the letter carrier, who informed him that a male known to him as Lorenzo Gadson inquired about an express package addressed to 12 Dover Street. (Id. at 77:6-19.) The letter carrier told Detective Chabot that he knew Gadson; that he previously resided at 12 Dover Street; and that he continued to receive mail and packages there. This information was significant to DiFilippo because he knew from his investigation that narcotics were being distributed through the mail, and Defendant and Gadson were checking on a package for an address where neither resided. Based on this information, Detective DiFilippo contacted Postal Inspector Al Correia of the United States Postal Service and asked him to check if there were any packages for that address in the system. (Id. at 77:22 – 78:3.)

In the meantime, and shortly after Detective Chabot spoke with the mail carrier, Oladosu's vehicle left the area. Detective DiFilippo continued to follow as the car made several brief stops, ultimately parking in front of a residence at 68 Glover Street. (Id. at 75:11-17.) There, Oladosu's passenger exited the car and walked into the residence, and Oladosu drove away. (Id. at 75:17-21.)

On the following day, March 30, officers continued their surveillance. (Id. at 78:6-8.) DiFilippo, and other members of the task force, set up on Dover Street and Glover Street. Task force members observed Lorenzo Gadson looking through mail on the porch at 12 Dover Street. (Id. at 78:23 – 79:1.) Eventually, Gadson walked away from 12 Dover Street and Detective DiFilippo picked up the surveillance as he walked into 68 Glover Street. (Id. at 79:6.)

Detective DiFilippo then received word that Inspector Correia had an express package for 12 Dover Street. (Id. at 79:17-21.) DiFilippo responded to the post office, where he observed a package, sent from India and addressed to Kelvin Brown at 12 Dover Street. A K-9, trained in narcotics detection, alerted on the package. (Id. at 80:6-7.) Agents decided to conduct a controlled delivery, with Inspector Correia acting in an undercover capacity.

During this time, Detective DiFilippo was also monitoring the GPS and learned that Defendant Oladosu left his residence. DiFilippo informed his team members, who began physical surveillance. Defendant drove to a Rite-Aid parking lot, from which 12 Dover Street was visible. There, he made contact with Gadson, who entered his car.

Around this time, Postal Inspector Correia headed to 12 Dover Street to make the controlled delivery. At the 12 Dover

Street address, Gadson exited Oladosu's car and approached Inspector Correia. Correia and Gadson discussed the fact that the post office had attempted delivery of the package the day before and had left a card to be filled out. Gadson retrieved the card from Oladosu's car and handed it to Inspector Correia, who then asked Gadson to sign for the package. Gadson took the package and returned to Oladosu's car. As Oladosu's car attempted to leave the Rite-Aid parking lot, it was stopped by members of the HIDTA task force and a uniformed trooper.

Oladosu and Gadson were both removed from the car, and Detective DiFilippo took custody of the package from the passenger-side floor. It was later determined that the package contained a purse and six pairs of sandals. Contained in the purse were two packets of heroin; embedded in the soles of the sandals were packets containing approximately 761 grams of heroin.

Gadson and Oladosu were transported separately back to Oladosu's house. On the front porch, Detective DiFilippo advised Oladosu of his constitutional rights in the presence of one or two other detectives. Oladosu indicated that he understood his rights and signed a rights waiver form. (Ex. 10.) Detective DiFilippo described Oladosu's demeanor as very calm and polite.

Oladosu also signed a consent to search form, which authorized the Rhode Island State/HIDTA Task Force Members to search his residence, his car, and the package. (Ex. 11.) Prior to Oladosu's signing the form, Detective DiFilippo read the entire form to him, and Oladosu indicated that he understood the form. According to Detective DiFilippo, no weapons were drawn, no force was used, and no promises or threats were made prior to Oladosu signing these two forms. Both forms were executed at 12:45 p.m.

The officers then searched Oladosu's home. When that search was complete, they responded to the Rhode Island State Police Barracks in Lincoln where Detective DiFilippo conducted a recorded interview of Oladosu at 2:23 p.m. (Ex. 12.) Detective DiFilippo testified that no firearms were displayed, no force was used, and no threats or promises were made during this interview. He described Oladosu's demeanor as calm.

At the beginning of the recorded interview, Detective DiFilippo advised Defendant of his rights again. Oladosu indicated that he understood his rights and also confirmed that he had signed a rights form and a consent to search form earlier in the day. Toward the end of the interview, in an apparent effort to get Oladosu to talk, Detectives DiFilippo and Chabot informed Oladosu that they had been monitoring and watching him. (Id. at 18 ("I've been monitoring you and I've been watching

you."); id. at 19 ("We've been following you for several weeks now. . . . And we know every move."); id. at 20 ("We know you go to North Attleboro on Hope Street. We – we've been monitoring you."); id. at 23 ("We've been following you. We've studied you. We're well aware of your travels and your behaviors.").) Shortly thereafter, at approximately 2:48 p.m., the interview concluded.

At 3:30 p.m. on the same day (March 30) the GPS was removed from Oladosu's vehicle at the Rhode Island Police Barracks in Lincoln.

III. Discussion

A. Good Faith

The government now acknowledges -- as it must -- that the use of the GPS in this case was a violation of the Fourth Amendment warrant requirement as held in Jones. The government argues that Defendant's motion nevertheless should be denied on the basis of the good faith doctrine. Specifically, the government argues that, because the officers acted in objectively reasonable reliance on judicial precedent in obtaining the GPS tracking information, that information, as well as derivative information, should not be excluded as a result of the Fourth Amendment violation under the exclusionary rule because the good faith exception as recently applied in Davis v. United States, 131 S. Ct. 2419 (2011), applies here.

12

The Supreme Court has "repeatedly held" that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." Id. at 2426. Accordingly, the Supreme Court has "limited the rule's operation to situations in which this purpose is 'thought most efficaciously served.'" Id. at 2426 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" Id. at 2426-27 (omission in original) (quoting United States v. Janis, 428 U.S. 433, 454 (1976)).

Yet, while "[r]eal deterrent value is a 'necessary condition for exclusion,' . . . it is not 'a sufficient' one." Id. at 2427 (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)). Any analysis must also "account for the 'substantial social costs' generated by the rule," mindful that exclusion "exacts a heavy toll on both the judicial system and society at large." Id. (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). Since suppression almost always "requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," the "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." Id. "[S]ociety must swallow this bitter pill . . . only as a 'last resort.'" Id. (quoting Hudson, 547

U.S. at 591).  Accordingly, the benefits of deterrence must outweigh the heavy costs for exclusion to be appropriate.  Id.

In Davis, the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  131 S. Ct. at 2423-24.  Its holding was predicated on a determination that "suppression would do nothing to deter police misconduct in these circumstances" and "would come at a high cost to both the truth and the public safety."  Id. at 2423.  The Davis court appropriately confined its holding to the question and facts before it -- "whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent."  Id. at 2428.  And because, in that case, the search incident to arrest "followed the Eleventh Circuit's . . . precedent to the letter," the Court determined that "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way."  Id.  The Court concluded that, "when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities."  Id. (emphasis in original).

The holding in Davis has prompted a mini-flurry of judicial decisions regarding its application, post-Jones, to cases in

which GPS monitoring began before _Jones_ was decided.
Defendants, like Oladosu, have advocated, generally speaking,
that _Davis_'s "binding circuit precedent" language creates a
strict limitation on the good faith exception. Some district
courts have adopted this approach, while others have not (as
discussed below). One obvious problem with this approach is the
bind it creates in circuits where no "binding circuit precedent"
exists. In this Court's view, this rigid reading of _Davis_
cannot withstand scrutiny, at least in the context of the facts
presented in this case.

_Davis_ was decided on its facts; it was a slam-dunk
application of the good faith doctrine, and the Supreme Court's
forceful language reflects that. But, it is clear, as Justice
Sotomayor pointed out in her concurring opinion, that _Davis_ did
"not present the markedly different question whether the
exclusionary rule applies when the law governing the
constitutionality of a particular search is unsettled" or
"whether exclusion would appreciably deter Fourth Amendment
violations when the governing law is unsettled." _Id._ at 2435,
2436 (Sotomayor, J., concurring in the judgment). Clearly, the
Supreme Court anticipated that the questions left unanswered by
_Davis_ would need to be worked out in subsequent cases. And
cases that involve the use of GPS monitoring devices before,

during, and after the holding of <u>Jones</u>, raise such questions in spades.[4]

_____

[4] As of the date of this opinion, two district courts have held that law enforcement could rely on non-binding appellate precedent from other circuits. <u>See</u> <u>United States v. Baez</u>, Criminal Action No. 10-10275-DPW, 2012 WL 2914318, at *1 (D. Mass. July 16, 2012); <u>United States v. Leon</u>, No. CR 09-00452 JMS, 2012 WL 1081962, at *4-5 (D. Haw. Mar. 28, 2012).

Four district courts have held to the contrary. <u>See</u> <u>United States v. Ortiz</u>, Criminal Action No. 11-251-08, 2012 WL 2951391, at *1 (E.D. Pa. July 20, 2012); <u>United States v. Lujan</u>, Criminal Action No. 2:11CR11-SA, 2012 WL 2861546, at *3 (N.D. Miss. July 11, 2012); <u>United States v. Lee</u>, Criminal No. 11-65-ART, 2012 WL 1880621, at *6-10 (E.D. Ky. May 22, 2012); <u>United States v. Katzin</u>, Criminal Action No. 11-226, 2012 WL 1646894, at *10 (E.D. Pa. May 9, 2012).

A number of other courts have opined on the meaning of <u>Davis</u>, without directly ruling on the question before this Court. <u>See</u> <u>United States v. Barraza-Maldonado</u>, Case No. 12-CR-0054 (PJS/SER), 2012 WL 2952312, at *7 (D. Minn. July 19, 2012) ("[I]f it is clear under Second Circuit precedent that a particular type of search is lawful, clear under Fourth Circuit precedent that the same search is not lawful, and not clear under Sixth Circuit precedent whether or not the search is lawful, then <u>Davis</u> protects searches within the Second Circuit but not searches within the Fourth and Sixth Circuits."); <u>United States v. Luna-Santillanes</u>, No. 11-20492, 2012 WL 1019601, at *9 n.5 (E.D. Mich. Mar. 26, 2012) (declining to reach the question but stating that it would find persuasive the government's argument that, "because the use of a GPS device on a vehicle without first obtaining a search warrant was a widely-accepted practice in the police community that had not been held unconstitutional by the Sixth Circuit Court of Appeals, the <u>Leon</u> good faith exception . . . would apply."); <u>United States v. Nwobi</u>, No. CR 10-952(C) GHK-7, 2012 WL 769746, at *3 (C.D. Cal. Mar. 7, 2012) (observing that the <u>Davis</u> good faith exception "could not have applied to the evidence sought to be suppressed in <u>Jones</u>, which arose out of the D.C. Circuit, because at the time of the installation and use of the GPS device in <u>Jones</u>,

To understand and apply Davis in the context of this (or any other) case in which law enforcement officers were acting in an environment where no binding circuit precedent was available, it is necessary, in the first instance, to view the opinion as part of the Supreme Court's evolving jurisprudence on the exclusionary rule. The Davis Court began with an explication of the underlying reasoning and Fourth Amendment principles that guided its analysis. Justice Alito, writing for the Court, discussed the historical development and application of the exclusionary rule, beginning with an admission that "[t]here was a time when [the Supreme Court's] exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine." Id. Justice Alito then charted the rule's development from a "self-executing mandate implicit in the Fourth Amendment itself," id. (citing Olmstead v. United States, 277 U.S. 438,

there was no binding D.C. Circuit precedent authorizing the warrantless installation of GPS tracking devices on suspects' vehicles"); United States v. Debruhl, 38 A.3d 293, 297-98, 297 n.33 (D.C. 2012) (stating that, in assessing whether there was binding appellate precedent on point, "we are to focus on the appellate jurisprudence of this court" (citing Briscoe v. State, 30 A.3d 870, 883 (Md. 2011))); Briscoe, 30 A.3d at 882-83 (stating that, in order to determine whether Davis applies to the search, "we must examine what Maryland law dictated at the time of that search"); id. at 883 ("We understand the Davis Court's reference to binding appellate precedent to mean that the caselaw of the jurisdiction must have been clear about whether that jurisdiction had adopted the bright-line rule of Belton.").

462 (1928); <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961)), to a 1971 decision in which "the Court 'treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule,'" <u>id.</u> (quoting <u>Arizona v. Evans</u>, 514 U.S. 1, 13 (1995)) (citing <u>Whitely v. Warden, Wyo. State Penitentiary</u>, 401 U.S. 560, 568-69 (1971)), until the Court "came to acknowledge the exclusionary rule for what it undoubtedly is -- a 'judicially created remedy' of this Court's own making," <u>id.</u> (quoting <u>Calandra</u>, 414 U.S. at 348). Justice Alito noted that, over time, the Court "abandoned the old, 'reflexive' application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits." <u>Id.</u> (quoting <u>Evans</u>, 514 U.S. at 13). Through <u>Leon</u> and its progeny, the Supreme Court "recalibrated [its] cost-benefit analysis in exclusionary cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue." <u>Id.</u> at 2427 (quoting <u>Leon</u>, 468 U.S. at 909).

"The basic insight of the <u>Leon</u> line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." <u>Id.</u> (brackets in original) (quoting <u>Herring v. United States</u>, 555 U.S. 135, 143 (2009)). "[I]n 27 years of practice under <u>Leon</u>'s good-faith exception," the Supreme Court has "'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." <u>Id.</u> at 2429 (quoting

*Herring*, 555 U.S. at 144). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 2427 (internal quotation marks omitted). On the other hand, "when the police act with an objectively 'reasonable good faith belief' that their conduct is *lawful*, . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 2427–28 (emphasis added) (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 909, 919).

As much as Defendant here, like those in the cases reviewed above and below, latches on to the term "binding circuit precedent," as suggesting a limitation on the good faith rule, it was the "absence of police culpability" that "doom[ed] Davis's claim." *Id.* at 2428. The Court determined, by reference to *Leon* and its progeny, that application of the exclusionary rule would "[p]enaliz[e] the officer for the [appellate judges'] error" and could not "logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 2429 (brackets in original) (quoting *Illinois v. Krull*, 480 U.S. 340, 350 (1987)). The Court further observed that "all that exclusion would deter in this case is conscientious police work," while "discourage[ing] the officer from 'doing his duty.'" *Id.* (quoting *Leon*, 468 U.S. at 920).

At the end of the day, the Supreme Court in Davis undertook what has become the standard good faith assessment of the "culpability" of law enforcement and whether police acted with "an objectively 'reasonable good faith belief' that their conduct [was] lawful." Id. at 2427 (quoting Leon, 468 U.S. at 909). The district courts wrestling with this question post-Davis have all essentially undertaken that same assessment. And while some have held that law enforcement can rely in good faith on non-binding precedent, and others have held to the contrary, like the Davis court, all of these courts have done so in the context of the facts presented. Compare United States v. Baez, Criminal Action No. 10-10275-DPW, 2012 WL 2914318, at *1 (D. Mass. July 16, 2012), and United States v. Leon, No. CR 09-00452 JMS, 2012 WL 1081962, at *4-5 (D. Haw. Mar. 28, 2012), with United States v. Ortiz, Criminal Action No. 11-251-08, 2012 WL 2951391, at *1 (E.D. Pa. July 20, 2012), and United States v. Lujan, Criminal Action No. 2:11CR11-SA, 2012 WL 2861546, at *3 (N.D. Miss. July 11, 2012), and United States v. Lee, Criminal No. 11-65-ART, 2012 WL 1880621, at *6-10 (E.D. Ky. May 22, 2012), and United States v. Katzin, Criminal Action No. 11-226, 2012 WL 1646894, at *10 (E.D. Pa. May 9, 2012).

In a recent and well-reasoned opinion, the United States District Court for the District of Massachusetts -- apparently, the only other case in this Circuit to address the issue --

offered a useful framework. _Baez_, 2012 WL 2914318, at *6. In _Baez_, Judge Woodlock first observed that "the immediate implications of _Davis_ for _Jones_ in the circuits are arrayed along a rather narrow spectrum." _Id._ He then suggested that this "spectrum can be refined further by plotting a time dimension that identifies when the issue first became unsettled as a result of [the D.C. Circuit's opinion in] _Maynard_ and when it was resettled by the Supreme Court for all courts in _Jones_." _Id._ Taking a cue from Judge Woodlock's formulation, the Court has plotted a timeline -- including relevant legal developments and pertinent facts drawn from the six cases to have addressed this same question. The relevant facts in Defendant Oladosu's case appear in bold. This timeline is revealing:

| 1981 | Fifth Circuit: "[I]nstallation and monitoring of the beeper [not] violation of [defendant's] fourth amendment rights." <br> United States v. Michael, 645 F.2d 252, 259 (5th Cir. 1981) (en banc). |
|------|------|
| 1983 | U.S. Supreme Court: beeper monitoring on public roads not a search or seizure within the meaning of the Fourth Amendment. <br> United States v. Knotts, 460 U.S. 276, 285 (1983). |
| 1984 | U.S. Supreme Court: monitoring of a beeper in a private residence constitutes a search and requires a warrant. <br> United States v. Karo, 468 U.S. 705, 714-18 (1984). |

| 1999 | Ninth Circuit: placement of magnetized tracking devices on vehicle undercarriage not Fourth Amendment violation.<br><br>United States v. McIver, 186 F.3d 1119, 1126-27 (9th Cir. 1999). |
|---|---|
| 2007 | Seventh Circuit: GPS attachment and monitoring not a search and no warrant required.<br><br>United States v. Garcia, 474 F.3d 994, 996-97 (7th Cir. 2007). |
| Mar. 16, 2009 | Leon (D. Haw.): GPS attached.<br><br>2012 WL 1081962, at *1. |
| Aug. 27, 2009 | Baez (D. Mass): GPS attached.<br><br>2012 WL 2914318, at *2. |
| Jan. 11, 2010 | Ninth Circuit: mobile tracking device attachment and monitoring not a search.<br><br>United States v. Pineda-Moreno, 591 F.3d 1212, 1215, 1217 (9th Cir. 2010). |
| **Feb. 12, 2010** | **DiFilippo attaches GPS to Oladosu's car.** |
| **Mar. 30, 2010** | **Oladosu arrested; GPS use terminated.** |
| May 21, 2010 | Eighth Circuit: "[W]hen police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time."<br><br>United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010) (in dicta). |
| Aug. 6, 2010 | D.C. Circuit: warrantless use of GPS for one month was a search.<br><br>United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010). |

| Aug. 12, 2010 | Ninth Circuit: Chief Judge Kozinski, joined by four other judges, authors vigorous dissent from denial of rehearing en banc. "To say that the police may do on your property what urchins might do spells the end of Fourth Amendment protections for most people's curtilage." United States v. Pineda-Moreno, 617 F.3d 1120, 1123 (9th Cir. 2010) (Kozinski, J., dissenting from the denial of rehearing en banc). "The electronic tracking devices used by the police in this case have little in common with the primitive devices in Knotts." Id. at 1124. "I don't think most people in the United States would agree with the panel that someone who leaves his car parked in his driveway outside the door of his home invites people to crawl under it and attach a device that will track the vehicle's every movement and transmit that information to total strangers." Id. at 1126. Judge Reinhardt, who joined in Chief Judge Kozinski's dissent, also authored a brief dissent. |
| --- | --- |
| Oct. 31, 2010 | Lujan (N.D. Miss.): GPS attached.<br>2012 WL 2861546, at *2. |
| Dec. 13, 2010 | Katzin (E.D. Pa.): GPS attached.<br>2012 WL 1646894, at *2. |
| Jan. 24, 2011 | Ortiz (E.D. Pa.): GPS attached.<br>2012 WL 2951391, at *6-7. |
| June 27, 2011 | U.S. Supreme Court: cert granted in Jones.<br>131 S. Ct. 3064 |
| Sept. 2, 2011 | Lee (E.D. Ky.): GPS attached.<br>2012 WL 1880621, at *1. |

In Ortiz, Lujan, Lee, and Katzin, the district courts adopted a bright-line rule: law enforcement cannot rely in good

faith on non-binding precedent from other circuits. See Ortiz, 2012 WL 2951391, at *1 ("[T]he so-called 'good faith' exception to the exclusionary rule does not apply due to the absence of binding precedent authorizing warrantless GPS installation and tracking."); Lujan, 2012 WL 2861546, at *3 ("[A]pplication of the good faith exception in this instance, where the Fifth Circuit precedent at the time the tracker was placed could only apply to GPS by anology, is overly broad."); Lee, 2012 WL 1880621, at *6-10 (stating that, because there was no binding appellate precedent in the Sixth Circuit, "DEA agents in this case did not act within the confines of the good-faith exception"); Katzin, 2012 WL 1646894, at *10 (declining to extend good faith exception in absence of binding authority).

The district courts in Baez and Leon held to the contrary. In Baez, the court crafted a different rule, permitting law enforcement to rely on a "substantial consensus among precedential courts." See Baez, 2012 WL 2914318, at *1 ("Where, as here, law enforcement officers at the time they act have a good faith basis to rely upon a substantial consensus among precedential courts, suppression of probative evidence is too high a price to pay because of the subsequent supervention of that consensus by the Supreme Court."). The Leon court, on the other hand, declined to adopt a rule but rather evaluated whether the conduct of law enforcement was objectively

reasonable based upon an examination of judicial precedent at the time of the GPS use.  See Leon, 2012 WL 108196, at *4-5 (observing that, because there was no binding precedent authorizing the practice at the time, Davis did not control, but "after examining precedent as of 2009, the court finds that the agents' conduct in the use of the GPS tracking device was objectively reasonable").

Despite these divergent approaches, the district court results are not necessarily at odds with one another when plotted on the Baez-inspired timeline.  What emerges from all of these decisions is a common theme – assessment of police culpability, based on the legal landscape at the time of the GPS attachment.  Drawing from the collective experience of these district courts, this Court joins with the district court in Leon in declining to adopt a bright-line rule.  The better approach in this Court's view is to conduct an analysis of whether law enforcement relied in good faith on judicial precedent, which in turn requires a case-by-case assessment of the legal landscape at the time of the Fourth Amendment violation at issue.

If the agents in this case had placed the GPS after both Maynard and Judge Kozinksi's dissent, as agents did in the

_Lujan_, _Katzin_, _Ortiz_, and _Lee_[5] cases, the outcome here may have been different, and this Court might have concluded as those courts did, that the good faith exception should not apply. This is because, after _Maynard_ and the Kozinski dissent, the law was unsettled and law enforcement officials in circuits where no binding precedent was present were arguably on notice that use of a GPS device may require a warrant. In this situation, it might not have been objectively reasonable for law enforcement to rely on the decisions of the Seventh, Eighth, and Ninth Circuits. It could be that proceeding to use a warrantless GPS in the face of emerging uncertainty would be a "reckless[] or grossly negligent disregard for Fourth Amendment rights." See _Davis_, 131 S. Ct. at 2427 (internal quotations omitted). The requisite "culpability" could be there. See _id._ at 2428.

Here, just as in _Baez_ and _Leon_, however, the requisite "culpability" of law enforcement is simply not there. This "absence of police culpability," to use _Davis_'s words, "dooms" Oladosu's claim. See _id._ At the time Detective DiFilippo attached the GPS to Defendant Oladosu's car, the United States Supreme Court had sanctioned the use of beeper technology without a warrant, and two circuits had ruled, in what appeared

_____
[5] Law enforcement's reliance on non-binding precedent in _Lee_ strikes the Court as particularly problematic, since it occurred _after_ the Supreme Court granted cert in _Jones_.

to be a growing consensus, that the beeper precedent was analogous and applicable to GPS use. Just as in <u>Davis</u>, law enforcement here acted "with an objectively 'reasonable good-faith belief' that their conduct [was] lawful." <u>Id.</u> at 2427 (quoting <u>Leon</u>, 468 U.S. at 909); <u>see also</u> <u>Baez</u>, 2012 WL 2914318, at *4; <u>Leon</u>, 2012 WL 1081962, at *4-5.

Not only does suppression in these contexts "fail[] to yield 'appreciable deterrence,'" <u>see</u> <u>Davis</u>, 131 S. Ct. at 2426-27 (quoting <u>Janis</u>, 428 U.S. at 454), a prerequisite to application of the exclusionary rule, but to the contrary, by discouraging the lawful use of new investigatory tools, it would only "discourage the officer from 'do[ing] his duty,'" <u>see</u> <u>id.</u> at 2429. "It is one thing for the criminal 'to go free because the constable has blundered,'" <u>id.</u> at 2434 (quoting <u>People v. Defore</u>, 150 N.E. 585, 587 (N.Y. 1926)), but "quite another to set the criminal free because the constable has scrupulously adhered to governing law," <u>id.</u>

B.    Attenuation

Having determined that the good faith exception to the exclusionary rule applies, the Court does not reach the government's attenuation argument.

IV.  Conclusion

For the foregoing reasons, Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

*/s/ William E. Smith*

William E. Smith
United States District Judge
Date: August 21, 2012